[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Gerard J. Strol brought these two consolidated cases seeking to set aside and declare as null and void two quit claim deeds, both dated May 19, 1994 and filed in the respective town clerks' offices of New Milford and Danbury on May 20, 1994, claiming that Gerard Strol had no intention of conveying his interests in his New Milford and Danbury properties but was tricked into signing the deeds by his brother, defendant Ronald H. Strol, who told Gerard that he was signing documents relating to their boat business. The plaintiff Gerard also asks for damages in the amount of lost rents from May 20, 1994 to the present time, double damages, attorneys fees and costs. Defendant Marie F. Strol has been named as party defendant because she was the purported grantee under these two quit claim deeds.
The plaintiff Gerard and the defendant Ronald are brothers. Gerard, four years younger, worked for Ronald for twenty years from 1974 to 1994 as the service manager of the marina on Candlewood Lake in New Milford called Marineland, Inc. Gerard's job consisted of repairing motor boats, running the docks on the lakefront, and assisting boat owners in storing their boats over CT Page 5433-HHH the winter. Ronald took care of all the boat sales and financial management of the Marineland business. Ronald was the President and sole shareholder of Marineland, and handled all of the paperwork. Ronald was Gerard's boss, set his salary and supervised his activities at Marineland.
Ronald was also engaged in many other business activities including a substantial real estate empire which ultimately grew to over 100 real estate properties by the late 1980's, consisting of residential homes, condos and apartments he owned and rented out. Ronald and his wife, Joyce Strol, managed all of these 100 plus properties, finding tenants, collecting rents, paying expenses, repairs, taxes, and insurance. Since the 1970's, Ronald has held a Connecticut real estate agent's license, and has attended the required continuing education courses to maintain it.
On December 30, 1976, Gerard purchased from Ronald a single family residence known as Cedar Terrace in Danbury, Connecticut by warranty deed filed in the Danbury Land Records, Vol. 589, Page 973 (Exhibit P-3). Gerard gave Ronald a mortgage deed dated December 30, 1976 to secure a promissory note from Gerard to Ronald in the amount of $28,477.50, recorded in the Danbury Land Records, Vol. 589, Page 975 (Exhibit P-4). Gerard also assumed a mortgage on the property to People's Bank from Ronald in the face amount of $28,000 dated August 14, 1972 and filed in the Danbury Land Records, Vol. 520, Page 454 (Exhibit P-2). Ronald and Ronald's wife Joyce managed the property for Gerard in the same way as they managed the many other real estate properties Ronald owned at that time, finding tenants, paying expenses, collecting rents, and paying off the two mortgages on the property.
On December 22, 1986, Gerard received from his mother Marie the single family residence known as 6 Candlewood Springs, New Milford by quit claim deed filed in the New Milford Land Records in Vol. 361, Page 333 (Exhibit P-11) executed by Ronald using the power of attorney from Marie filed on the New Milford Land Records, Vol. 361, Page 331 (Exhibit P-10). As for the Danbury house, this property was managed by Ronald and Joyce Strol who used the rentals to pay taxes, insurance, and repairs, with the excess being used to pay off the two mortgages on the Danbury property. The People's Bank mortgage was ultimately paid off in 1991. (Exhibit P-9).
Every year, Gerard's accountant, who was also Ronald's CT Page 5433-III accountant, would get from Ronald an accounting of the income and expenses for the two properties which would then be reported on Gerard's Form 1040 at Schedule E. At trial, Gerard testified that these properties resulted in a net taxable income of $2,676 in 1991 and $2,476 in 1992, and a net loss of $1,866 in 1993.
Gerard testified at trial that he did maintenance work from time to time on the properties and paid real estate taxes for one of the properties when the rental account was short.
Each week, during their twenty years of working together, Ronald would present Gerard with documents to sign which Ronald told Gerard concerned the marina business, such as boat registrations and titles.
In Ronald's deposition (Exhibit P-22 at page 39), as introduced at trial, Ronald admitted that "at the time Gerard signed that (the quit claim deed from the Danbury property), prior to my bankruptcy, Gerard would sign anything and everything that was put in front of him."
Ronald's real estate empire collapsed in 1990 and on March 28, 1991 he filed for Chapter 11 bankruptcy which was converted to Chapter 7 on March 4, 1993. As a result, Ronald lost all of his real estate holdings and other assets.
In June of 1994, Gerard discovered that on May 20, 1994, quit claim deeds dated May 19, 1994 (Exhibits P-7 and P-13) had been filed on the Danbury and New Milford Land Records, purporting to transfer Gerard's interest in the properties to Marie. Gerard went to the New Milford and Danbury Police Departments to swear out complaints against Ronald for forgery and on July 28, 1994 started the present actions in the Danbury and Litchfield Superior Courts, and filed lis pendens on both land records. The Danbury Superior Court action was transferred to the Litchfield Superior Court and given the new docket number CV 95 0068350S.
At trial Gerard has testified that he had no recollection of ever signing quit claims deeds, and the only possibility as to how his signature could have gotten on those deeds was that he had been tricked by Ronald into signing them when Ronald put them in with other documents relating to the Marineland business which needed Gerard's signature. It is significant that each of the deeds has a checkmark next to where Gerard signed, in the same way that Ronald always checked places for Gerard to sign the CT Page 5433-JJJ Marineland documents which needed his signature.
Gerard testified that he had no intention of transferring the properties to Marie at anytime. Gerard testified that he needed these properties because he desperately needed a place to live for his wife and three children now that the bankruptcy trustee was selling 20 Greenwood Road in New Milford, the house where he and his family had been living. If so, it is unreasonable for the transfer to have been made to Marie Strol.
Ronald, by his own admission, stated that when Gerard signed the deeds, the date was left blank, and then years later a date was typed in, May 19, 1994, known to Ronald to be false, and done without Gerard's permission. Ronald testified at trial that he went to the New Milford Town Hall and executed the notary portion of the deed, when he knew that Gerard had not signed the deed on May 19, 1994, nor had Gerard acknowledged that on that date or any other date that it was his free act and deed.
Ronald insisted that Gerard had signed the quit claims deeds in late December 1986 or early January 1987 to coincide with the time that Gerard acquired the Mew Milford property from Marie on December 22, 1986. Time and again during his testimony, Ronald confirmed that the two quit claim deeds were signed in late December of 1986 and at no other time.
Exhibits P-6 and P-12, the original quit claim deeds, are forms imprinted with the name of the law firm, "Guendelsberger and Taylor". Attorney Kenneth E. Taylor testified at trial that these quit claim deed forms could not have existed until sometime in 1990 because the name of his firm had not changed until January 1, 1990. This is clear evidence from an unimpeached third party that Ronald was lying to the Court in asserting that the quit claim deeds had been signed in December 1986 or January 1987, in order to coincide with the conveyance of the New Milford property to Gerard.
During the trial, Gerard's counsel questioned Ronald about how Gerard's signatures had gotten on the conveyance tax return forms which were filed with the quit claim deeds in Danbury and New Milford town clerk offices, Exhibits P-8 and P-14. Gerard's signature on these two conveyance tax returns was a mystery for the plaintiff in this case. In depositions, Gerard's attorney asked Ronald, Marie and Joyce Strol if they had or knew who had signed Gerard's signature. All three denied any knowledge. CT Page 5433-KKK Finally, near the end of the trial, the defendants called Joyce Strol, Ronald's wife, who testified that she forged Gerard's signature on the two conveyance tax returns.
The court pointed out that Joyce Strol's "Strol" in her name as a witness to the quit claims deeds, is completely different from the "Strol" she wrote in forging Gerard's signature on the conveyance tax forms to make it look exactly like his.
Joyce's explanation of being given permission by an unnamed town clerk to forge Gerard's signature is not credible. She testified that she took the blank conveyance tax forms home with her on May 19, 1994, typed them at home that night, and then went to file them with the deeds the next day. At home she had already typed Gerard's name in the space next to the signature block, and it is doubtful that she could have executed such a perfect forgery of Gerard's signature while standing in front of a clerk.
Another indication of the fraud and deception perpetrated by Ronald on Gerard, is that Ronald never told Gerard that the quit claim deeds had been filed. The implication is that Ronald was afraid of Gerard's reaction, which would be to protest the validity of these deeds and file a lis pendens on the land records to contest the transfer. The longer it took Gerard to find out, the more time Ronald had to use his mother's power of attorney to sell the property to an innocent third party.
Joyce Strol's testimony, as one of the witness to the quit claim deeds, the other being Ronald, is deceptive and vague. When the court questioned her about the deeds, she had to conclude that she had no memory about it.
Ronald Strol maintains the explanation that he was only parking the two properties in Gerard's name when in fact they belonged to someone else, either himself or his mother depending on which contradictory response was believable that he testified to. It is significant that Ronald, who acquired over 100 pieces of real estate, has been unable to point to any writing which proves that this improbable scheme was ever consented to. The statute of frauds bars enforcement of agreements concerning real estate which are not in writing. Connecticut General Statutes Section 52-550 (a).
The quit claim deeds must be set aside because there was no delivery, in that Gerard was tricked by Ronald into signing the CT Page 5433-LLL quit claim deeds and never intended to convey title to Marie.
The delivery of a deed coupled with the intent by the grantor to pass title is essential to a valid conveyance. McCook v.Coutu, 31 Conn. App. 696 (1993); Bell v. Bloom, 146 Conn. 307,309 (1959); Wiley v. London Lanchashire Fire Insurance Co.,89 Conn. 35, 39 (1914). Delivery of a deed depends on the intent of the grantor as manifested by his words and acts and is a question of fact. Lomartira v. Lomartira, 159 Conn. 558 (1970).
While the burden of proof of the non-delivery of a deed is usually on the party asserting the non-delivery, this burden is based upon the fact that the acknowledgement is prima facie proof of delivery. Sweeney v. Sweeney, 126 Conn. 391, 394 (1940). In this case, however, Ronald admitted that the acknowledgement he signed as notary was completely fabricated in that Gerard never signed the deeds on May 19, 1994 nor did Gerard acknowledge it to be his free act and deed.
The evidence presented during the trial is conclusive that there was no delivery of the quit claim deeds in that Ronald fraudulently induced Gerard to sign the deeds by disguising them, that Ronald kept the deeds until May 19, 1994, and falsely filled in the blanks on the deed on May 19, 1994 and gave them to Marie and Joyce for filing. Gerard consistently testified that he never intended to convey the two properties to Marie. Based upon this lack of intent to convey title as manifested by Gerard's testimony and all of the facts presented in this case, the deeds are invalid.
With regard to the second count for forgery, by his own admission, Ronald forged the quit claim deeds in that he falsely completed and falsely altered them as defined in Connecticut General Statutes Section 53a-137 (5) and (6) by filling in the blanks of the quit claim deeds, including the dates of the deeds if not the entire deeds, after they had been signed by Gerard, and by falsely completing the acknowledgement as notary public stating that Gerard had signed and acknowledged the deeds on May 19, 1994, when he knew that to be false.
Forgery is defined in General Statutes Sec. 53a-137 as follows:
 (1) "Written instrument" means any instrument or article containing written or printed matter or the equivalent CT Page 5433-MMM thereof, used for the purpose of reciting, embodying, conveying or recording information or constituting a symbol or evidence of value, right, privilege or identification, which is capable of being used to the advantage or disadvantage of some person.
 (2) "Complete written instrument" means one which purports to be a genuine written instrument fully drawn with respect to every essential feature thereof. An endorsement, attestation, acknowledgment or other similar signature or statement is deemed both a complete written instrument in itself and a part of the main instrument in which it is contained or to which it attaches.
 (3) "Incomplete written instrument" means one which contains some matter by way of content or authentication but which requires additional matter in order to render it a complete written instrument.
 (4) A person "falsely makes's a written instrument when he makes or draws a complete written instrument in its entirety, or an incomplete written instrument, which purports to be an authentic creation of its ostensible maker or drawer, but which is not such either because the ostensible maker or drawer is fictitious or because, if real, he did not authorize the making or drawing thereof.
 (5) A person "falsely completes" a written instrument when by adding, inserting or changing matter, he transforms an incomplete written instrument into a complete one, without the authority of anyone entitled to grant it, so that such complete instrument appears or purports to be in all respects an authentic creation of or fully authorized by its ostensible maker or drawer. . . .
 (7) "Forged instrument's means a written instrument which has been falsely made, completed or altered. (Emphasis supplied)
By completing the two deeds in question on May 19, 1994, Ronald Strol changed an incomplete instrument into a complete one by falsely completing them, thereby creating forged instruments.
Gerard in the third and fourth counts of the complaint claims violations of CUTPA based upon the fraud and forgery perpetrated CT Page 5433-NNN on Gerard by Ronald. Ronald, as the evidence at trial proved, was a licensed real estate broker who had amassed more than 100 real estate properties prior to his bankruptcy. Gerard had trusted him to manage his two properties in Danbury and New Milford because Ronald was also managing all of the 100 plus real estate properties that he owned. Under these circumstances, by fraudulently inducing Gerard into signing the quit claims deeds and then by forging them, he committed unfair trade practices under Connecticut General Statutes Section 42-110b(a) which provides that "no person shall engage in unfair or deceptive acts or practices in the conduct of any trade or commerce." Ronald is responsible under CUTPA for his acts of fraud and forgery as a person who was in the real estate business and the management of rental properties. See Dow Condon, Inc. v. Anderson, 204 Conn. 475,484 (1987) where the unethical, oppressive and unscrupulous behavior of a real estate developer was held to constitute a CUTPA violation.
In addition to an order of the court declaring the quit claim deeds null and void, the plaintiff also seeks damages against Ronald Strol for loss of rental income; double damages for forgery; and attorneys fees.
Attorneys fees and costs are sought as punitive damages under the first and second count and/or statutorily awarded attorneys fees under CUTPA in the third and fourth count. When the tort is willful, wanton or malicious, as in this case, the injured party may recover punitive damages in addition to compensatory damages.Lentine v. McAvoy, 105 Conn. 528 (1927). Section 42-110g also provides for the award of punitive damages at the court's discretion.
The court finds that for all of the foregoing reasons, the two quit claim deeds dated May 19, 1994 from Gerard J. Strol to Marie F. Strol recorded in Danbury Land Records, Book 1087, Page 1086, and New Milford Land Records, Volume 494, Page 601 are ordered set aside and declared null and void, and damages are awarded to the plaintiff, Gerard Strol, from the defendant Ronald Strol in the amount of $5,500.00 in lost rent, $11,000.00 for double damages and $5,500.00 for attorneys fees, a total of $16,500.00.
PICKETT, J. CT Page 5433-OOO